UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BAM BAGS, LLC,

                              Plaintiff,

            - against -

ZIP-IT LTD.,

                              Defendant.

**OPINION AND ORDER**

15 Civ. 2172 (ER)

Ramos, D.J.

 BAM BAGS, LLC ("BAM BAGS" or "Plaintiff") brings this action against ZIP-IT LTD.

("ZIP-IT" or "Defendant"), for the alleged infringement of a novelty handbag patent.  BAM

BAGS develops fashion accessories, especially handbags, for a high-end boutique market.  *Id.* ¶

9.  ZIP-IT is in the business of distributing and selling purses, handbags, pencil cases and related

products for a mass market.  *Id.* ¶ 18.  The dispute arises out of a licensing agreement whereby

ZIP-IT agreed to pay royalties for selling BAM BAGS' patented products.  BAM BAGS claims

that ZIP-It infringed the patent when it stopped paying royalties, but ZIP-IT counters that it does

not owe royalties because the patent is invalid.  Presently before the Court is ZIP-IT's motion for

partial summary judgment ("MPSJ").  Doc. 98.  For the reasons set forth below, the motion is

DENIED.

## I. Factual Background

 In 2004, Beth Metsch ("Metsch"), an architect and designer who lived in Colorado,

entered a friendly competition with her mother, Barbara Metsch, to design an accessory out of a

single zipper.  Ex. B at 250, Doc. 100.  Metsch created a handbag made from a continuous

zipper.  *Id.* at 19.  She called it a ZIPPURSE.  BAM BAGS' Opposition ¶ 2, Doc. 112.  Metsch

showed the bag to her mother and gave her a sample one as a gift. Ex. B at 272, Doc. 100.

Metsch also showed the ZIPPURSE to other relatives and a few friends, including Yvette del

Torre, the owner of The Pink Purse, a fashion-accessories store which sold high-end handbags,

*id*. at 276–78. Her mother and friends thought the ZIPPURSE was so entertaining they ordered

bags and so did "a bunch of stores." Ex. C, "ZIPIT 002182," Doc. 100.

Believing she had a good idea, Metsch took steps to protect and commercialize her

invention. On June 16, 2004, she purchased a domain name for ZIPPURSE. Ex. B at 101, Doc.

100. Metsch also displayed the ZIPPURSE on her website www.bambags.com, *id.,* but claims

she did not sell any bags through the website until December 2004, *id*. at 140. ZIP-IT submitted

an internet archive printout as evidence that Metsch displayed the ZIPPURSE on the BAM

BAGS website as early as July 28, 2004. Ex. C, "ZIPIT 002055," Doc. 100.

From August 1–3, 2004, Metsch showcased the ZIPPURSE at a trade show in New York

City. *Id*. at 2. She was careful to not put the bags out before the show started because she did

not want anyone to steal her idea. *Id*. at 3. Metsch received offers from interested buyers at the

trade show and arranged to manufacture those orders after she returned home to Colorado. *Id*.

After the trade show, Metsch worked with a patent lawyer to obtain a patent and a trademark for

the ZIPPURSE. Compl. ¶ 10, Doc. 1. On August 1, 2005, Metsch filed a patent application for

the ZIPPURSE, exactly one year after she displayed it and took orders at the trade show. *Id*. On

August 8, 2005, Metsch filed an application to register the ZIPPURSE trademark ("ZIPPURSE

Mark") and the BAM BAGS trademark ("BAM BAGS Mark"). *Id*. Both marks were registered

in connection with handbags, change purses, and cosmetic cases. *Id*.

On March 31, 2009, more than years after Metsch filed the patent application, the United

States Patent and Trademark Office ("USPTO") issued her a utility and design patent, Serial No.

7,509,985 B2 (the "'985 Patent"), entitled "Handbag–with novel features," for the ZIPPURSE, "a unique handbag constructed from one continuous length of zipper." Compl. at Ex.1. The '985 Patent discloses how the ZIPPURSE differs from similar prior inventions, i.e. no protective liner formed from the dual-purpose slide fastener tapes, and the objects of the invention, including providing a novel construction for a fashionable handbag formed from a single compound, lightweight tape with slide fastener attachments along the periphery. Ex. D, Doc. 100.

Metsch licensed the ZIPPURSE trademark and patent to various companies. In 2006, Metsch filed a trademark infringement case in Florida against two companies it had entered into licensing agreements with, Overbreak, LLC and JUST ZIP-IT, LLC. Ex. A (the "*Overbreak* Complaint"), Doc. 100. Despite the similar name, the defendant Israeli company in this action, ZIP-IT, LTD, does not claim a connection to the defendant Florida company, ZIP-IT, LLC, in the *Overbreak* Complaint. According to the complaint, Overbreak was in the business of marketing and distributing novelty, "knock-off" products. *Id.* at 6. Around July 2005, Metsch received suspicious phone calls from a man seeking to acquire ZIPPURSEs and discovered that the calls came from Overbreak. *Id.* She went on Overbreak's and discovered a link to a site operated by JUST ZIP-IT, LLC, which advertised the sale of a handbag constructed from a continuous length of zipper called the "ZIP-IT," which was "confusingly similar" to the ZIPPURSE. *Id.* at 7. The claims against Overbreak were dismissed with prejudice on September 20, 2006 and the claims against JUST ZIP-IT, LLC were dismissed without prejudice on October 13, 2006. ZIP-IT's MPSJ n.1, Doc. 100.

On October 1, 2009, after obtaining the '985 Patent, Metsch, doing business as BAM BAGS, entered into an exclusive license agreement ("License") with ZIP-IT. Compl. Ex. 4,

Doc. 1. Metsch granted ZIP-IT an exclusive license to make, use, sell, offer to sell, and import any products covered by the '985 Patent ("Licensed Products"). Compl. ¶ 14. Metsch also granted ZIP-IT an exclusive license to use the BAM BAGS Mark in connection with the sale of the Licensed Products. *Id.* ZIP-IT agreed to pay a royalty based on gross sales of the Licensed Products. *Id.* ¶ 15.

Initially, ZIP-IT sold the Licensed Products, paid royalties and submitted quarterly reports to Metsch, pursuant to the License. *Id.* ¶ 19. But by November 6, 2014, ZIP-IT had failed to make royalty payments or provide reports for three consecutive quarters. Compl. ¶ 21, Doc. 1. Metsch sent ZIP-IT a notice of breach and gave 30 days to cure. *Id.* at Ex. 6. Initially, ZIP-IT promised to send Metsch the royalty report, but they did not do so. *Id.* ¶ 22. On November 26, 2014, ZIP-IT told Metsch it was "impractical" for them to continue paying the agreed-upon royalty rate and asked for a lower rate. Compl. ¶ 23, Doc. 1. But Metsch refused to lower the rate and on December 10, 2014, Metsch's counsel sent ZIP-IT a notice of breach of contract. *Id.* at Ex. 8. In the letter, ZIP-IT was given an additional seven days to cure or else it would be considered in breach. *Id.*

By letter dated December 15, 2014, ZIP-IT's counsel denied that they breached the License. Compl. ¶ 25, Doc. 1. ZIP-IT compared the '985 Patent with the Zipper Bags sold by ZIP-IT and concluded the '985 Patent was invalid, and they did not owe royalties under the License. *Id.* During 2015, ZIP-IT continued to sell the Licensed Products without paying royalties. *Id.* ¶ 26. On March 3, 2015, Metsch assigned her rights, title, and goodwill (including the right to sue for past infringement) in the '985 Patent, the BAM BAGS Mark, and the ZIPPURSE Mark, to BAM BAGS. *Id.* ¶ 27. Later that month, BAM BAGS sued ZIP-IT for breaching the License and infringing on the '985 Patent.

## II.     Procedural Background

BAM BAGS filed the instant complaint on March 23, 2015 asserting two causes of action:  patent infringement and trademark infringement.  Doc 1.  ZIP-IT answered on June 8, 2015 denying the allegations and counterclaiming that (1) the '985 Patent is invalid, (2) the ZIPPURSE trademark was improvidently allowed and should be cancelled, (3) and, in the alternative, the ZIPPURSE Mark infringes on the Zip It Mark because the Zip It Mark predates it.  Doc. 10.  On March 3, 2016, the Court held a *Markman* hearing to resolve disputes about the '985 Patent's claim construction, the technical terms that define the scope of the patent.  On March 30, 2018, the Court issued an Order detailing its findings on the patent claims.  Doc. 90.  On October 5, 2018, ZIP-IT filed the instant motion alleging that:  (1) the '985 Patent is invalid under 35 U.S.C. § 102(b)'s public-use and on-sale statutory bars, (2) if valid, ZIP-IT's products do not infringe the '985 Patent, and (3) in the alternative, that the '985 Patent is invalid because of anticipation and obviousness.  Doc. 100.  BAM BAGS filed its opposition on November 13, 2018, Doc. 112, and ZIP-IT replied on November 27, 2018, Doc. 116.

## III.    Standard of Review

The standard of review for a motion for summary judgment in a patent infringement case is the same as in any other type of action.  *See Union Carbide Corp. v. Am. Can Co.*, 724 F.2d 1567, 1571 (Fed.Cir.1984).  Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might affect the outcome of the litigation under the governing law.  *Id.*  The party moving for summary

judgment is initially responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (citing *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (citation omitted). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjectures or surmises. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). Rather, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68.

## IV.    Applicable Law

A case arises under patent law if "federal patent law creates the cause of action" or if "the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law…." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 684 (2d Cir. 2009). "The United States Court of Appeals for the Federal Circuit [has] exclusive jurisdiction of an appeal from a final decision of a district court of the United States…in any civil action arising under…any Act of Congress relating to patents…." 28 U.S.C. § 1295(a)(1).

## V.     The '985 Patent Is Valid

ZIP-IT alleges that the '985 Patent is invalid under the 35 U.S.C. § 102(b) public use and on-sale bars.  MPSJ 4, Doc. 100.  Once issued, patents carry a presumption of validity.  35 U.S.C.A. § 282.  The USPTO is staffed by expert and experienced personnel qualified to determine patentability.  *Howes v. Great Lakes Press Corp.*, 679 F.2d 1023, 1028–29 (2d Cir. 1982).  However, "the ultimate validity of a patent is for the courts to decide as a matter of law."  *Id.* at 1028.  The proponent of an invalidity defense must establish invalidity by clear and convincing evidence.  *Microsoft Corp. v. I4I Ltd. Partnership*, 564 U.S. 91, 95 (2011).  Clear and convincing evidence convinces the court that the truth of the proponent's factual contentions is highly probable.  *Papyrus Tech. Corp. v. New York Stock Exch., LLC*, 653 F. Supp. 2d 402, 414 (S.D.N.Y. 2009), *aff'd*, 396 F. App'x 702 (Fed. Cir. 2010).

Patents are invalid under 35 U.S.C.A. § 102(b), if "the invention was...in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States."  "The date one year prior to the filing of the patent application is called the 'critical date.'"  *Cummings v. Adidas USA*, 716 F. Supp. 2d 323, 331 (S.D.N.Y. 2010).  To invalidate a patent, the proponent must first prove that the invention was ready for patenting prior to the critical date.  *See Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1379 (Fed. Cir. 2005) ("[T]he ready for patenting prong, applies to both of the other parts of section 102(b), 'on sale' and 'public use.'").

### i.     Ready for Patenting

As a threshold matter, the Court determines that the ZIPPURSE was ready for patenting prior to the critical date.  Metsch filed a patent for the ZIPPURSE on August 1, 2005, Compl. ¶ 10, Doc. 1, accordingly, the critical date is August 1, 2004.  A court can determine whether an

invention is ready for patenting "by proof that it was reduced to practice, or by proof that the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Cummings*, 716 F. Supp. 2d at 335. An invention is only reduced to practice when it is shown to work for its intended purpose, such as when it is composed or made. *Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359, 1370 (Fed. Cir. 2007). *In re Omeprazole Patent Litig.*, 536 F.3d 1361, 1373 (Fed. Cir. 2008) ("To demonstrate reduction to practice, a party must prove that the inventor (1) 'constructed an embodiment or performed a process that met all the limitations' and (2) 'determined that the invention would work for its intended purpose.'" (quoting *Cooper v. Goldfarb*, 154 F.3d 1321, 1327 (Fed.Cir.1998)).

ZIP-IT asserts that the ZIPPURSE was ready for patenting before the trade show because Metsch gave one to her mother and showed samples to other family and friends, including the owner of a handbag store. MPSJ 6, Doc. 100. And Metsch admits that she gave a ZIPPURSE to her mother as a gift prior to the critical date. Ex. B at 272, Doc. 100; s*ee Pronova Biopharma Norge AS v. Teva Pharm. USA, Inc.*, 549 F. App'x 934, 938 (Fed. Cir. 2013) (finding invention was ready for patenting when inventor gave someone a sample without confidentiality restrictions). Metsch testified that within a day or two of the competition with her mother in 2004, she sewed what "ultimately became the Zippurse" and that she used the "fabric-to-fabric, overturned sewing style," done "the way [the ZIPPURSEs] are sewed today." Compl. ¶ 10, Doc. 1; Ex. B at 258–62, 266–67, Doc. 100. This shows that the bag Metsch gave her mother was a construction that embodied the limitations contained in the patent and worked for its intended purpose. Lastly, BAM BAGS acknowledges that Metsch giving a ZIPPURSE to her mother is "the only possible 'reduction to practice' dated prior to August 1, 2004." BAM BAGS

Opposition 14 n.1, Doc. 112. BAM BAGS also admitted to the following Rule 56.1 statement: "The Zippurse was reduced to practice prior to August 1, 2004." Rule 56.1 Counter Statement ¶ 15, Doc. 111. Therefore, the ZIPPURSE was ready for patenting prior to the critical date.

### ii. Public Use Bar

"Whether a patent is invalid due to public use under § 102(b) is a question of law based on underlying questions of fact." *Pronova Biopharma Norge AS v. Teva Pharm. USA, Inc.*, 549 F. App'x 934, 938 (Fed. Cir. 2013). To qualify as "in public use" under § 102(b), an invention must have been either "accessible to the public" or "commercially exploited." *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1380 (Fed. Cir. 2005). This policy discourages removing inventions from the public domain, that the public has reasonably come to believe is freely available. *Dey, L.P. v. Sunovion Pharm., Inc.*, 715 F.3d 1351, 1355 (Fed. Cir. 2013).

#### 1. Public accessibility

The classical standard for assessing the public nature of a use was established by the Supreme Court in *Egbert v. Lippmann*. 104 U.S. 333, 336 (1881) (holding patent was publicly accessible when the inventor gave his invention of corset springs to a lady friend, who wore them for a long time "without limitation or restriction, or injunction of secrecy."); *see also Clock Spring, L.P. v. Wrapmaster, Inc.*, 560 F.3d 1317, 1325 (Fed. Cir. 2009) ("An invention is in public use if it is shown to or used by an individual other than the inventor under no limitation, restriction, or obligation of confidentiality."). The *Egbert* case turned on the lack of control the inventor maintained over the invention. *Dey, L.P. v. Sunovion Pharm., Inc.*, 715 F.3d 1351, 1359 (Fed. Cir. 2013).

However, summary judgment on a public-use inquiry is inappropriate when the circumstances show a reasonable expectation of confidentiality. *Id.* at 1357. In assessing

accessibility to the public, courts have focused on several underlying facts: "the nature of the activity that occurred in public; the public access to and knowledge of the public use; [and] whether there was any confidentiality obligation imposed on persons who observed the use." *Barry v. Medtronic, Inc.*, 914 F.3d 1310, 1327 (Fed. Cir. 2019); *see also Delano Farms Co. v. Cal. Table Grape Comm'n*, 778 F.3d 1243, 1249 (Fed. Cir. 2015) ("[D]emonstration of a prototype to 'friends and colleagues' was not invalidating because the evidence supported the existence of 'a general understanding of confidentiality.'"); *Invitrogen*, 424 F.3d at 1381 ("[T]his court has determined that a use before the critical period was not public even without an express agreement of confidentiality."). Accordingly, when an inventor clearly limits and controls access to an invention, "depending upon the relationships of the observers and the inventor, an understanding of confidentiality can be implied." *Am. Seating Co. v. USSC Grp., Inc.*, 514 F.3d 1262, 1268 (Fed. Cir. 2008) (citing to *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1265 (Fed. Cir. 1986)).

Here, prior to August 1, 2004, Metsch gave her mother a sample ZIPPURSE. MPSJ 2, Doc. 100. Metsch also showed the ZIPPURSE to the owner of The Pink Purse and to family and friends, such as her husband, father, sister, and her former college roommate, Gwen Riddick. Ex. B, Metsch's Deposition 268, Doc. 100 ; *see also* Ex. 2 ("Barbara Metsch's Deposition") 25, Doc. 111. Lastly, ZIP-IT argues that Metsch displayed the ZIPPURSE on her website, www.bambags.com, on July 28, 2004, three days prior to the critical date. ZIP-IT's MPSJ Memo 2, Doc. 100.

BAM BAGS argues that while Metsch showed the ZIPPURSE to family and friends, she did so in in private and had "an understanding of confidentiality" with them. BAM BAGS Opposition 16, Doc. 112. Given the close relationship between Metsch and the family and

friends she showed the ZIPPURSE to, an understanding of confidentiality can be implied. *Moleculon*, 793 F.2d at 1265 (finding understanding of confidentiality when inventor showed the invention to close colleagues—which the court considered no different than showing it to close friends at home—and retained control of the invention).

Similarly, showing the ZIPPURSE to someone in the handbag industry, like Yvette del Torre, the owner of The Pink Purse handbag store, does not count as public use. If the person who sees the invention has the skill and knowledge to understand and easily demonstrate the invention to others, then the lack of a confidentiality agreement becomes significant. *Netscape Commc'ns Corp. v. Konrad*, 295 F.3d 1315, 1321 (Fed. Cir. 2002). However, there is no indication that Del Torre knew how to make handbags.

### a. Public Accessibility and the Internet

ZIP-IT's submits an archived July 28, 2004 printout of www.bambags.com with pictures of ZIPPURSEs in various styles and information for purchasing them (by calling or emailing BAM BAGS); as proof that the ZIPPURSE was publicly available prior to the critical date. Ex. C, "ZIPIT 002055," Doc. 100. ZIP-IT also presents a notarized affidavit from the office manager of the Internet Archive, which runs the Wayback Machine, who asserts the printouts are a true and correct copy of the files in their records. *Id*. at Ex. C, "ZIPIT 002041–42." Metsch denies posting the ZIPPURSE on the BAM BAGS website before August 1, 2004 and asserts that the printout is not authenticated and cannot be admitted as evidence. BAM BAGS Opposition 12, Doc. 112. She surmises that she may have posted the ZIPPURSE to the website that day as a test. Ex. B at 118–19, Doc. 100 ("The program that I used when I was designing the site, in order to view what you're doing, it posts it briefly so you can see, like test it. So I don't believe that I officially posted it until after I came back [from the trade show]").

The experimental use of a patent may negate the public use prong of the statutory bar. *Invitrogen*, 424 F.3d at 1380; *see also Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 65 (1998) ("[A]n inventor who seeks to perfect his discovery may conduct extensive testing without losing his right to obtain a patent for his invention—even if such testing occurs in the public eye."). ZIP IT does not provide any other evidence, which would lead this Court to conclude the patent is invalid because, construing the facts in the light most favorable to BAM BAGS, it was briefly posted to a website as a test. Therefore, even if the Court finds that the internet printout was properly authenticated, it is not clear and convincing proof that Metsch made the ZIPPURSE publicly available prior to the critical date.

### 2. *Commercial Exploitation*

The Court does not find clear and convincing evidence that Metsch commercially exploited the ZIPPURSE prior to the critical date. Commercial exploitation includes the sale of the invention, or charge of its use, for commercial benefits. *Invitrogen*, 424 F.3d at 1382. ZIP-IT's commercial exploitation argument rests solely on the following language from the *Overbreak* Complaint, a complaint which BAM BAGS filed against a former trademark licensee in 2006:

> And so the Zippurse™ was born. Ms. Metsch's completely unzippable purse was so entertaining, her mother ordered a few and so did a bunch of stores. Thereafter, in early August of 2004…BAM displayed several models of the Zippurse™ to retailers attending the Fame Show at the Jacob Javitz Center in New York City.

Ex. A ¶ 13, Doc. 100. Metsch disputes that the word "Thereafter" places the orders prior to the August 1, 2004 date, and instead, argues that it refers to prior statements about her development of the product. BAM BAGS Opposition 14, Doc. 112. Merriam-Webster defines "thereafter" as "after that," which refers to an action after a specific point in time. MERRIAM-WEBSTER

COLLEGIATE DICTIONARY, *available at* https://www.merriam-webster.com/dictionary/thereafter.  Here, "thereafter" immediately follows the sentence about purchase orders, not the sentence about the ZIPPURSE's development.  This suggests that the trade show happened after friends and stores had already made orders, but this evidence merely relies on semantics and is not clear and convincing.  Metsch's formulation is also not unreasonable.  Thus, on summary judgment, the Court may not resolve this dispute in favor of the moving party.  Accordingly, the Court does not find the '985 Patent is invalid under the public use bar.

### iii.    On-Sale Bar

Patents are invalid under the statutory on-sale bar, if the invention was "on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C.A. § 102(b) (West).  In *Pfaff*, the Supreme Court explained that "the on-sale bar applies when two conditions are satisfied before the critical date."  525 U.S. at 67.  "*First*, the product must be the subject of a commercial offer for sale…."*Second*, the invention must be ready for patenting."  *Id.* (emphasis added).  Even "a single sale or offer for sale suffices to bar patentability" and "[a]cceptance of a purchase order for the patented invention constitutes a commercial sale for on-sale bar purposes."  *Cummings*, 716 F. Supp. 2d at 333–34.  This Court has already established that the ZIPPURSE was ready for patenting prior to the critical date, and so the second condition is satisfied.  *See supra* Part V(a).  But ZIP-IT only relies on the language in the *Overbreak* Complaint, which as discussed above, does not show the ZIPPURSE was subject to commercial exploitation, including a commercial offer of sale, prior to August 1, 2004. *See supra* Part V(b).

A defendant raising an invalidity defense bears a "heavy burden of persuasion" which requires proof that is clear and convincing. *Radio Corp. of Am. v. Radio Eng'g Labs.*, 293 U.S. 1, 8 (1934). ZIP-IT does not provide clear proof that the '985 Patent was in public use or on sale prior to the trade show that began on August 1, 2004, such that no reasonable jury could find otherwise. *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 962 (Fed.Cir.2001). Accordingly, the Court does not find the '985 Patent is invalid due to the public-use or on-sale bars.

## VI.    ZIP-IT'S ACCUSED PRODUCTS INFRINGE ON THE '985 PATENT

Having found that the '985 Patent is not invalidated by the public-use or on-sale bars, the Court determines whether ZIP-IT infringed on it. Patent infringement suits are typically "inappropriate for summary disposition," particularly when the motion consists almost entirely of factual allegations and is practically barren of citations to legal authority that would support judgment as a matter of law. *Alloc, Inc. v. Norman D. Lifton Co.*, 653 F. Supp. 2d 469, 474 (S.D.N.Y. 2009). Patent infringement is determined by comparing the properly construed patent claims to the accused product. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Claim construction is a question of law for the court but the comparison of the claim to the accused product is a question of fact. *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998).

"It is…well settled that each element of a claim is material and essential, and that in order for a court to find infringement, the plaintiff must show the presence of every element or its substantial equivalent in the accused device." *Liberty Ammunition, Inc. v. U.S.*, 835 F.3d 1388, 1398–99 (Fed. Cir. 2016) (citation omitted); *see also Alloc*, 653 F. Supp. 2d at 474 ("To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly."). The party alleging infringement bears the burden of showing each element of the

claim in the accused product: "Summary judgment of noninfringement is appropriate where the patent owner's proof is deficient in meeting an essential part of the legal standard for infringement, because such failure will render all other facts immaterial." *Liberty*, 835 F.3d at 1369.

The '985 Patent discloses a "bag made from a continuous zipper," and claims to be an improvement on prior versions of handbags made from a continuous zipper. MPSJ 11, Doc. 100. Claim 1 of the '985 Patent states the following:

> [A] A container suitable for hand carry formed with longitudinally fastened successive tiers of a spiraled elongated compound tape, [B] the compound tape being comprised of two relatively wide elongated tapes, [C] the wide elongated tapes having continuous attachment means fastened longitudinally adjacent one extended longitudinal edge of each tape, respectively, [D] the two wide elongated tapes further being securely attached together longitudinally along the mid-sections thereof, [E] the wide elongated tapes then having, respectively, longitudinal foldable tape material opposite the respective tape edges upon which fasteners have been fixedly attached, [F] whereby successive spiraled sections of the compound tape may be attached to one another forming a container having an exterior and an interior, [G] the exterior of the successive tiers of attached compound tape providing readily accessible access to the longitudinal fasteners and [H] the interior of the successive tiers of attached compound tape being provided with a protective liner formed by the longitudinal folded tape material of the respective wide elongated tapes.

Ex. D at 5, Doc. 100 (element designations A–H added). Elements C and D of Claim 1 of the '985 Patent are at issue here. ZIP-IT contends the Accused Products do not have the additional improvement elements the '985 Patent claims. *Id.* Specifically, ZIP-IT claims that the Accused products do not have longitudinal folded tape material, or a protective liner subsequently formed from said material. *Id.* According to ZIP-IT, the Accused Products do not have longitudinal folded tape material because the seam is two millimeters wide and cannot be folded. MPSJ 12–13, Doc. 100. What is being folded lengthwise is "the material opposite the zippered edges of the tape," also known as the "seam allowance." *Markman* Order 17–18, Doc. 90. The dispute

between the parties was "exactly how much material is required or necessary to be on the side of the seam opposite the zippered edges." *Id*. at 18. Anthony Cady, ZIP-IT's expert, reported that "the predominant difference that I see between the two products as it relates to claim of the '985 Patent is the length of the seam allowance located in the interior of the respective bags." Ex. G at 27, Doc. 97.

The Court disagreed with ZIP-IT's proposed construction that the material needs enough fabric to fold back on itself: "the '985 Patent at no point describes exactly where the two tapes should be attached." *Markman* Order 18, Doc. 90. Furthermore, the Court found that to require a particular amount of fabric to be on the side of the seam opposite from the zippered edge would improperly limit the scope of the '985 Patent. *Id.* Accordingly, ZIP-IT's argument that a two-millimeter seam allowance means the Accused Products do not have longitudinal folded tape material fails. But even if it did not, summary judgment is not appropriate because the question of whether ZIP-IT's Accused Products infringe on the '985 Patent raises a genuine dispute of material fact. BAM BAGS expert, Aneta Genova, found infringement in her report when she examined a sample Accused Product and found that the seam allowance was "about four to five millimeters." BAM BAGS Opposition 21, Doc. 112.

Lastly, as ZIP-IT notes, the Court concluded that the "the elongated tape material itself is the 'protective liner.'" MPSJ 18, Doc. 100. Therefore, ZIP-IT's second argument about the lack of a "protective liner formed by the longitudinal folded tape material" also fails because it depends on whether the Accused Products have longitudinal folded tape material. *Id.* at 14. In sum, ZIP-IT's Accused Products meet each element of Claim 1, and the Court finds they infringe on the '985 Patent. Accordingly, the Court cannot grant summary judgment in favor of ZIP-IT.

## VII.  ANTICIPATION AND OBVIOUSNESS INVALIDITY CLAIMS

In the alternative, ZIP-IT argues that the '985 Patent is invalid for anticipation and obviousness.  "Patent claims are invalid, and therefore cannot be infringed upon, if they are either 'anticipated' or 'obvious.'"  *Alloc*, 653 F. Supp. 2d at 476.  "A patent claim is anticipated if every element of the claim is disclosed in a prior art reference."  *Id.*; 35 U.S.C. § 102(a).  "A patent claim is obvious if the differences between it and claims contained in prior art "are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  *Alloc*, 653 F. Supp. 2d at 476; 35 U.S.C. § 103(a).  To obtain summary judgment in a patent case, a party bears a heavy burden "because it is "go[ing] over the same ground" as the U.S. Patent and Trademark Office ("PTO")."  *Alloc*, 653 F. Supp. 2d at 477.  "[T]he party attacking the patent's validity must demonstrate 'that the PTO was wrong in its decision to grant the patent.'"  *Id.* at 479.

### a.  Anticipation

A person is entitled to a patent unless the invention was known or patented by others prior to the inventor's application for a patent.  35 U.S.C. § 102(a).  A patent is invalid due to anticipation when "a single prior art reference...expressly or inherently disclose[s] each claim limitation."  *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1334 (Fed. Cir. 2008).  "But disclosure of each element is not quite enough—this court has long held that "'[a]nticipation requires the presence in a single prior art disclosure of all elements of a claimed invention *arranged as in the claim*.'"  *Id.* at 1334 (citing *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548 (Fed. Cir. 1983)).

ZIP-IT alleges that a prior art reference, U.S. Patent Application No. 10/059,026, Publication No. 20020142123 (published Oct. 3, 2002) (Yamaguchi et al., applicants) ("Yamaguchi '123"), meets every element of Claim 1 of the '985 Patent. MPSJ 20, Doc. 100. Yamaguchi '123 is a patent application for a hand-carried zipper bag made from an elongated tape, with an interior side. *Id.* at 20–21. ZIP-IT claims that the "only novel feature described in Claim 1 which might distinguish from prior art is the protective liner formed from the longitudinal folded tape material." *Id.* at 21.

Elements A, B, and C of the '985 Patent describe a product "formed with longitudinally fastened successive tiers of a spiraled elongated compound tape, the compound tape being comprised of two relatively wide elongated tapes…having continuous attachment means" fastened on the edge of each tape. Ex. D at 5, Doc. 100. In other words, the ZIPPURSE is created from one long continuous compound zipper tape. Ex. B at 250, Doc. 100. Therefore, to anticipate, a prior reference must disclose a hand-carried container formed from a continuous, compound tape with attachment means, such as a zipper, fastened on the edges.

To check for anticipation, the Court examines the Yamaguchi '123 reference in some detail. Yamaguchi '123 is made from "a long tape main body" with "plural coupling elements attached along "a substantially entire periphery" of the tape. Ex. M, ZIPIT 100118–19, 100157, Doc. 100. BAM BAGS argues that the Yamaguchi '123 reference does not anticipate the '985 Patent because it does not include essential words in Claim 1 of the '985 Patent: "zipper" or "compound tape" or "relatively wide tapes" or "folded." BAM BAGS Opposition 24, Doc. 112. But the '985 Patent and Yamaguchi '123, respectively, refer to "zippers" as a type of "attachment means" and "plural coupling elements." Ex. L at 54, Doc. 100 (also describing

zippers as "continuous removable attachment means" and "slide fasteners with attachment teeth along the edges of the tape").

ZIP-IT's expert asserts that the Yamaguchi '123 creation process references a compound tape because the zipper elements are attached to two tape strips, which are then sewed into the main tape body: "This process necessarily involves a step at which two strips are joined together to form a compound tape." Ex. G at 38, Doc. 100. Yamaguchi '123 is formed from a "tape strip in which a plurality of the coupling elements [is] mounted continuously on the side edge is sewed along the entire periphery of the main tape body," in other words it is made of a tape strip that has a zippered tape sewed along the periphery. Ex. M at 7 ¶ 0124, Doc. 100. This Court construed "compound tape" in the '985 Patent as "two tapes joined." *Markman Order* 11, Doc. 90. Accordingly, Yamaguchi '123 does reference a "compound tape" as it has two tapes joined together.

However, while Yamaguchi '123 "discloses the use of overturned seam with interior seam allowances of unspecified length" it does not meet the limitation that the two tapes be joined longitudinally at their mid-section pursuant to Claim 1, Elements C–D of the '985 Patent. ZIP-IT MPSJ 22, Doc. 100. The compound tape in Claim 1 is "comprised of two relatively wide elongated tapes, " having "continuous attachment means fastened *longitudinally* adjacent one extended *longitudinal* edge of each tape," being "attached together *longitudinally* along the mid-sections," and having "*longitudinal* foldable tape material opposite the respective tape edges upon which the fasteners have been fixedly attached." Ex. D at 5, Doc. 100 (emphasis added).

On the other hand, Yamaguchi '123 has an attachment means that is sewed along the entire periphery of the tape main body, not just one longitudinal edge. Ex. M at 7 ¶ 0124, Doc. 100. Because in Yamaguchi '123 the attachment means are sewed around the periphery of

another tape, it cannot satisfy Element E of the '985 Patent ("the wide elongated tapes then having, respectively, longitudinal foldable tape material *opposite* the respective tape edges upon which fasteners have been fixedly attached"). Ex. D at 5, Doc. 100. By looking at the express language of the claims and the patent's written description, this Court concludes that Yamaguchi '123 does not disclose "each claim limitation." *Finisar Corp.*, 523 F.3d at 1334. Accordingly, the Court does not find the '985 Patent is invalid by anticipation.

### b. Obviousness

Obviousness is ultimately a question of law that is based on underlying facts. *Sandt Tech. Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1354 (Fed. Cir. 2001). The Supreme Court has long held that "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398, 416 (2007). "If a person of ordinary skill can implement a predictable variation, [35 U.S.C.] § 103 likely bars its patentability." *Id.* at 417. "In order to determine obviousness as a legal matter, four factual inquiries must be made,":

> (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) secondary considerations of nonobviousness, which in case law is often said to include commercial success, long-felt but unresolved need, failure of others, copying, and unexpected results.

*Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 662–63 (Fed. Cir. 2000) (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966)). "To determine summary judgment based on obviousness, it must first be determined whether the *Graham* inquiries raise any disputes about material facts." *B & G Plastics, Inc. v. E. Creative Indus., Inc.*, 269 F. Supp. 2d 450, 460 (S.D.N.Y. 2003).

The scope of the prior art includes all art that "is reasonably pertinent to the particular problem with which the invention [is] involved." *Optical Prod. Dev. Corp. v. Dimensional Media Assocs., Inc.*, 134 F. Supp. 2d 320, 326 (S.D.N.Y. 2001). ZIP-IT provides five prior art patents for zipper handbags that were published between 1987 and 2003, all prior to the '985 Patent (filed in 2005 and issued in 2009). MPSJ 24, Doc. 100. The pertinent prior art includes Yamaguchi '123, a 2002 patent application for a hand-carried zipper bag; Pegado '651-9F, a 2001 Brazilian industrial design registration for a zipper purse; Markoff '983, a 1987 U.S. patent for a zipper handbag; and Monti '553-0001, a 2004 Italian design patent for a zipper purse. Ex. G at 44–50, Doc. 100. The Yamaguchi '123 patent application was not approved, however, in 2003, the same inventor received a patent for a zipper handbag ("Yamaguchi '555"). *Id.* at 50. "A foreign patent may be used in evaluating the state of prior art under 35 U.S.C. [§] 103." *Leesona Corp. v. Varta Batteries, Inc.*, 522 F. Supp. 1304, 1340 (S.D.N.Y. 1981).

ii.     *Level of Ordinary Skill in the Art/ Differences Between Patent and Prior Art*

ZIP-IT relies on its expert to claim that the '985 Patent involves variations of prior art which are predictable to a person of ordinary skill in the art:

> [I]t would be obvious for a person or ordinary skill in the art to use known methods to combine or modify these prior art reference to achieve aesthetic and practical benefits by varying the number of elongated tapes, width of tapes, placement of seam, and type of seam (*i.e.*, overlapping versus overturned seams) to predictably arrive at each and every element of the invention of Claim 1 of the '985 Patent.

ZIP-IT MPSJ 25, Doc. 100 (emphasis in original). Obviousness may be found if a person of ordinary skill in the art could have predicted the use of the two tapes joined longitudinally at the mid-sections as a variation of the prior art references. *KSR*, 550 U.S. at 401 ("If a person of

ordinary skill in the art can implement a predictable variation, and would see the benefit of doing so, § 103 likely bars its patentability."). "A court must ask whether the improvement is more than the predictable use of prior art elements according to their established functions." *Id.*

ZIP-IT's expert argues that the process of sewing tape strips together to form a compound tape with zippered edges was invented prior to the '985 Patent, as was the process of sewing tapes using overturned seams (overturned and overlapped seams are the two primary types of seams). Ex. G at 50–51, Doc. 100. *See Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1161 (Fed. Cir. 2007) ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." (citing *KSR*, 550 U.S. at 398)).

To "prevent a hindsight-based obviousness analysis [the relevant inquiry] is whether there is a reason, suggestion, or motivation in the prior art or elsewhere that would have led one of ordinary skill in the art to combine the references." *Ruiz*, 234 F.3d at 664. A court must avoid the temptation to "use hindsight reconstruction to pick and choose among isolated disclosures in the prior art to deprecate the claimed invention." *Medinol Ltd.v. Guidant Corp.*, 412 F. Supp. 2d 301, 315 (2005). Section 103 requires that courts consider the invention "as a whole" rather than breaking it down into its component parts and finding a prior art reference for each one. *Id.* at 14.

ZIP-IT claims the '985 Patent combines  known elements of a hand bag and that variations such as the length and type of seam would be obvious to someone with ordinary skill in the art. Ex. G at 52, Doc. 100. Each prior art shows a handbag formed from tape strips with zippers on the edges, formed by the continuous spiral of the tape strips. *Id.* at 51. BAM BAGS acknowledges prior art references that were "belt-like elongated tape structures," including

Yamaguchi '555 and Markoff '983, and differentiates the earlier disclosed inventions as they: (1) were limited to forming a hand-carried container with only certain cylindrical or triangular shapes, (2) did not provide for a firm-shaped bottom or for having other geometric features, (3) were restricted in size to support an article and their use as a handbag was a secondary consideration, and (4) did not disclose means for providing a protective liner formed from the dual purpose slide fastener tapes. Ex. D, Doc. 100.

The "most pertinent prior art is Yamaguchi '123," as ZIP-IT claims it includes all elements of Claim 1. Ex. G at 44, 51, Doc. 100. Yamaguchi '123 provides instructions for sewing the tape main body in a way that produces various shapes and lengths, including a "rectangular case shaped accommodating body" and refers to Figs. 2 and 3, *see* Ex. M at Sheet 2, Doc. 100, which shows rectangular shaped bags, i*d.* at 8. "The belt-shaped body of this embodiment having such a structure can be folded into a compact style because it has flexibility in the longitudinal direction, so that it can be stored easily…." *Id.* at 12 (citations omitted). Yamaguchi '123 appears to reference a compound tape in its description: Although "the tape main body and the tape strip are manufactured integrally and continuously using a single tape material, this embodiment should not be restricted to this and it is permissible to join the tape main body and the tape strip manufactured separately, to connect the tape strip [longitudinally] to the other end of the tape main body by sewing or fusion." Ex. M. 10, Doc. 100 (citations omitted). However, in this instance "tape strip" means "an extension member extended from the other end of the tape main body" and not a zippered tape, like in the '985 Patent.

Markoff '983 discloses that "zipper halves" are affixed on the peripheral edge of the main belt-like strip, but it does not provide motivation for sewing the zipper halves together longitudinally and removing the main belt-like strip like the '985 Patent did. Ex. P 3, Doc. 100;

*see also* Exs. P (Pegado '651) and Q (Yamaguchi '555) (same). Pegado '651 references the creation of "an attachment condition of a covering body for protecting a stored object when the belt-like article is used as a storage body" to describe a strip of tape that protects the object stored in the case from contact with the exposed "engaging means." Ex. P 2, Doc. 100. ZIP-IT's expert references Monti '553-0001 but does not provide any analysis as to why it renders the '985 Patent invalid for obviousness. Ex. G at 49–50, Doc. 100. "Broad conclusory statements regarding the teaching of multiple references, standing alone, are not 'evidence' [of motivation to combine]." *Medinol*, 412 F. Supp. 2d at 315.

While the Court finds references to elements of Claim 1 in the five prior art references, no single one fully incorporates the teachings of the '985 Patent. Furthermore, there is no clear and convincing evidence that a person of ordinary skill in the art would have had the motivation or reason to create a compound tape from just the zipper halves.

### iii. *Secondary Considerations*

The parties do not provide any evidence of secondary considerations, and so the Court does not find it necessary to reach these factors.

## VIII. CONCLUSION

For the foregoing reasons, ZIP-IT's motion is DENIED. The parties are directed to appear for a status conference on July 18, 2019 at 10:00 A.M. The Clerk of the Court is respectfully directed to terminate the motion, Doc. 98.

It is SO ORDERED.

Dated:     June 26, 2019
           New York, New York

                                              Edgardo Ramos, U.S.D.J.